THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CHARLES VANCE, Defendant-Appellant.

First District (2nd Division)   No. 76-297

Opinion filed October 4, 1977.

James Geis and Andrew Berman, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Joan S. Cherry, and Neil H. Cohen, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Defendant, Charles Vance, was charged by indictment with the offense of murder in connection with the homicide of defendant's neighbor, Jesse Chappell. (Ill. Rev. Stat. 1973, ch. 38, par. 9—1.) Upon a jury trial

defendant was found to be guilty of the lesser included offense of voluntary manslaughter. Judgment was entered on the verdict and defendant was sentenced to serve a term of confinement of 6 years, 8 months to 20 years in the Illinois State Penitentiary.

From entry of the judgment of conviction defendant appeals contending: (1) that certain conduct of the prosecution in presenting its case to the jury was improper and served to deny defendant a fair trial; (2) that the evidence properly adduced at trial was insufficient to establish defendant's guilt beyond a reasonable doubt; and (3) that the sentence is excessive.

Our review of the record indicates that on July 10, 1974, the deceased, Jesse Chappell, and his wife Virginia (hereinafter "Virginia") resided in one of six apartments which comprised the fourth floor of a rooming house located at 503 North Wells Street in Chicago, Illinois. The defendant occupied an apartment adjacent to the Chappells' and located approximately 15 feet away. Defendant's apartment was located directly opposite the door giving access to the fourth floor from the street level and was positioned approximately midway between the floor's community kitchen and the Chappells' apartment which were situated at either end of a narrow hallway. Near the community kitchen was a community lavatory.

At trial, Virginia Chappell testified that she had the opportunity to observe defendant on several occasions during the day in question. She initially discovered defendant outside her doorway at noon and detected an odor of alcohol emanating from his person. She told defendant that he was intoxicated and suggested that he return to his apartment and "sleep it off." Defendant complied and she subsequently informed her husband, the deceased, that she had found defendant standing outside her door in a condition which she described as "pretty well lit up."

Several hours later, at approximately 6 p.m., she heard her husband enter the hallway through the fourth floor access door. She stated that soon thereafter she heard a "thud" which sounded as if "something had fallen." As she continued to listen, she heard her husband's voice which caused her to step into the hall. Looking toward the community kitchen, she observed her husband, defendant, and a neighbor named Mabel Boyd. Defendant was sitting upon the floor of the kitchen and the deceased was standing over him. The deceased ordered defendant to "stop throwing his weight around, respect the ladies and be nice." She also heard her husband order defendant to apologize for his actions. Defendant denied any act worthy of apology but, upon further urging by the deceased, defendant told Mrs. Chappell that he was sorry for whatever transgression concerned the deceased. Virginia persuaded her husband to return to their apartment. At trial, she denied that defendant

had been disrespectful to her, stated that she had known defendant several years, and indicated that there had been no enmity between her husband and defendant prior to that date.

Approximately three hours later, at 9 p.m., and before retiring for the evening, the deceased left his apartment carrying a small bucket to draw some water from the community kitchen. He returned with one bucket of water and then left once again in order to procure a second ration. Virginia Chappell remained in the kitchen of her apartment.

Virginia testified that she heard her husband making his way down the hallway when defendant was heard to say, "Hey nigger. Why did you hit me for?" She stated that she heard her husband reply, "Man, what is wrong with you?" She then heard three shots fired in rapid succession.

Virginia ran to the hallway where she observed her husband and defendant struggling for a gun held by defendant. Both men subsequently fell to the floor at a point approximately 15 feet from the Chappells' apartment. Virginia testified that as they lay on the floor she screamed, "You killed my husband, you bastard." According to Virginia, defendant replied, "You white bitch. I am going to shoot your ass, too." She fled and summoned police.

Chicago Police Officer Michael Fitzgerald testified that he arrived on the scene at approximately 9:45 p.m. and observed the deceased lying on top of the defendant on the hallway floor near the door to defendant's apartment. The deceased's head was positioned in the direction of the community kitchen. Officer Fitzgerald stated that he noticed blood covering both bodies, water on the hallway floor, and a galvanized bucket laying approximately three feet from the men. The bucket was neither inventoried nor submitted to chemical analysis.

Officer Fitzgerald examined the two men for vital signs and finding none in the deceased proceeded to defendant. Defendant began to speak incoherently and Officer Fitzgerald noted a strong odor of alcohol emanating from defendant.

Chicago Police Officer Robert Margelewski also arrived on the scene and conducted a search for the weapon. It was discovered underneath a bathtub in the community lavatory where it had been placed by a resident of the building shortly after the shooting. The firearm was owned by defendant and ballistics evidence adduced at trial established that this weapon had discharged the bullets which had killed Jesse Chappell. Post-mortem examination of Chappell's body revealed that Chappell had sustained gunshot wounds in the hand and chest and that the latter was discharged from a distance of 2-5 feet and proved fatal.

Defendant testified in his own behalf and admitted shooting Jesse Chappell but asserted that his actions were in self-defense.

Defendant stated that in the late afternoon hours of July 10, 1974, he

was sitting in the fourth floor community kitchen in the company of Mabel Boyd. According to defendant, the deceased approached, accused defendant of being disrespectful to Virginia Chappell, struck defendant in the chest with his fist causing defendant to fall to the floor and, drawing a butcher knife, ordered defendant to apologize. Defendant's protestations of innocence were to no avail and the deceased continued to threaten defendant at knifepoint saying, "Apologize you black son-of-a-bitch or I'll kill you." Defendant pleaded for his life, apologized and fled when the deceased returned to his apartment in the company of Virginia Chappell.

Defendant testified that he remained in his apartment for one hour and then walked downstairs to a tavern where he consumed a shot of whiskey and a glass of beer. Defendant thereafter walked to a mechanic's shop operated by a man identified as "One-legged Al," then, after obtaining a haircut at the private home of a friend, returned home, where he visited the apartment of a neighbor for approximately 30 minutes. Entering his apartment at approximately 9 p.m. and, according to defendant, due to a felt need to protect himself from Jesse Chappell, defendant placed a cocked and loaded revolver in the waistband of his trousers.

Thus armed, defendant left his apartment in order to walk his dog. Defendant indicated that as he was returning he was struck from behind three times about the head, the force of which caused him to stumble forward. He testified that he was approximately eight feet from his apartment when he turned, drew his gun, saw the deceased and said, "Get back nigger. Why you hit me for? Get back."

Defendant admitted that the deceased was unarmed but, according to defendant, Jesse Chappell lunged toward defendant and seized the hand in which defendant held his gun. A struggle ensued and one shot was fired into the air causing the men to be thrown apart. Defendant stated that when he regained his balance he observed the deceased at a distance of 4-5 feet and beginning to move toward defendant again. Defendant testified that he uttered, "My God, he is going to kill me," after which he shot the deceased twice and collapsed into unconsciousness. Defendant was transported to hospital facilities where he received medication and treatment for a head wound which required several stitches.

On cross-examination and over defense objection, defendant testified that he kept another loaded gun in his apartment. The prosecution also attempted to elicit testimony from defendant to the effect that he had informed a nurse who had treated him that he had been a heavy drinker. Defense objection to his line of questioning was sustained by the trial court.

Defendant also adduced the testimony of Mabel Boyd who substantially corroborated defendant's testimony regarding defendant's

afternoon altercation with Jesse Chappell. Although unable to ascertain from where the deceased drew his eight-inch butcher knife, Boyd testified that she observed the deceased wield the knife above defendant and, fearing that he would "come down with it," screamed and fled to her apartment.

In rebuttal, the prosecution adduced the testimony of Johnnie Mae Odis, the nurse who had treated defendant after the shooting. Odis stated that she had no independent recollection of treating defendant. She was allowed to refresh her memory by reading a report which she had written regarding defendant's medical condition. Odis then testified that defendant was treated for a laceration which he had received to his scalp. She further stated that while she was treating defendant she detected an odor of alcohol about his person and made a notation to this effect on defendant's chart. Her observations in these regards were reinforced on cross-examination. The prosecution also questioned Odis, "Did you have occasion at that time to ask Mr. Vance about his drinking habits?" Defense objection to this question was immediately sustained and the court instructed the jury to disregard the question.

Virginia Chappell was also called in rebuttal and testified that at the time of his death her husband had stood 5'7" and weighed 135 pounds. At the time of trial, defendant was of similar stature, standing 5'6" and weighing 133 pounds.

Defendant initially contends that he was acting reasonably in shooting decedent; that, in effect, he used reasonable force which he reasonably believed was necessary to save himself from imminent death or bodily harm. The State maintains that the proof established beyond a reasonable doubt that defendant's belief regarding necessity for use of force was unreasonable so that he was properly found guilty of voluntary manslaughter.

Section 9—2(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 9—2(b)) defines voluntary manslaughter as follows:

"A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable."

Section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 7—1) states:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily

harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

The issue of self-defense is one of fact. (*People v. Jordan* (1960), 18 Ill. 2d 489, 165 N.E.2d 296.) It is the function of the trier of fact to resolve conflicts in the evidence and to determine the credibility of witnesses. (*People v. Pelegri* (1968), 39 Ill. 2d 568, 237 N.E.2d 453.) A reviewing court will not interfere with such determinations unless the evidence is so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt. *People v. Davis* (1975), 33 Ill. App. 3d 105, 337 N.E.2d 256.

In the instant case, several pertinent facts are undisputed. It is uncontroverted that the killing was preceded by an altercation between defendant and the deceased on the afternoon of July 10, 1974. During the course of the altercation defendant was made to suffer verbal and physical abuse at the hands of decedent. According to defendant and Mabel Boyd, this abuse took the form of a threat of death at knifepoint.

It is also undisputed that on the date in question defendant had consumed a quantity of alcohol. By defendant's account, this amounted to only a shot of whiskey in combination with a glass of beer consumed in the early evening hours of July 10, 1974. The testimony of Virginia Chappell and Officer Fitzgerald suggested that defendant had been drinking and in a state of intoxication earlier that day and that his consumption, of necessity, was considerably in excess of defendant's estimation.

It is similarly beyond dispute that defendant armed himself in anticipation of a further altercation with decedent and that the shooting was immediately preceded by defendant's inquiry of decedent, "Hey nigger. Why did you hit me for?" It is, of course, the circumstances surrounding defendant's inquiry which are subject to dispute. Defendant contends that his inquiry was prompted by an attack launched by decedent that evening. While defendant testified that he did not observe decedent in the hallway prior to the alleged assault, defendant testified that decedent struck him about the head and infers that the instrument employed by the deceased was the metal water bucket. Defendant's head wound is consistent with such an assault.

The State counters, and the jury apparently concurred, that defendant's inquiry concerned the earlier afternoon altercation in which decedent struck defendant in the chest so that, several hours later and while fortified by a considerable quantity of alcohol, defendant interposed himself before the unarmed decedent and demanded satisfaction. This theory is partially corroborated by the testimony of Virginia Chappell who indicated that she heard her husband answer, in response to

defendant's inquiry, "Man, what is wrong with you?" At trial, Chappell also indicated that defendant threatened her life immediately after the shooting. Such factors would tend to discredit defendant's claim of self-defense.

There is no duty to retreat in the face of a wrongdoer, but it may also be noted that had defendant been assaulted by decedent without provocation, further confrontation might have been easily avoided by the expedient of a short retreat to the relative security of defendant's nearby apartment or the street below. (See *People v. Martinez* (1972), 4 Ill. App. 3d 1072, 1076, 283 N.E.2d 268, 271.) The logistics of the apartment complex and the physical location of the bodies following the shooting tend to suggest instead that defendant interposed himself before decedent as the latter proceeded toward the community kitchen rather than, as defendant suggests, he was ambushed by decedent as defendant proceeded from the kitchen toward his apartment. Defendant's head wound would also appear to be consistent with either the struggle which evidently ensued between defendant and decedent or defendant's subsequent physical collapse.

■■ ■ Defendant's contention, that since his eye-witness testimony concerning the circumstances surrounding the shooting stands unrefuted by similar testimony, his testimony must be taken as true, and the trier of fact should have found that he acted in self-defense, does not correctly apprehend the law of Illinois. It has frequently been held that where a defendant's statement is contradicted by facts and circumstantial evidence, the trier of fact need not believe the statement of defendant even though it is not directly contradicted by other eyewitnesses. (*People v. Warren* (1965), 33 Ill. 2d 168, 210 N.E.2d 507; *People v. Herron* (1970), 125 Ill. App. 2d 18, 260 N.E.2d 428.) In the instant case, evidence was adduced which would tend to discredit defendant's account of the shooting and such evidence was of sufficient strength to warrant the jury's verdict that defendant acted unreasonably in shooting Jesse Chappell.

Defendant also contends that certain testimony was introduced as evidence at trial which substantially prejudiced defendant's right to receive a fair trial before an impartial jury. In particular, defendant asserts that the testimony regarding his inebriated condition on the date of the incident, as well as the testimony relating to his ownership of a weapon other than the one which he used to kill the deceased, was improperly adduced.

■■ It cannot be doubted that evidence of defendant's level of intoxication on the date in question is material and relevant to the issue of the reasonableness of defendant's conduct and his belief that he was required to thwart a threat of imminent death or great bodily harm through the use of deadly force. Defendant concedes that this is the case.

See generally *People v. McGuire* (1960), 18 Ill. 2d 257, 163 N.E.2d 832.

Within this context, defendant suggests that the testimony of Johnnie Mae Odis, the nurse who examined and treated defendant subsequent to the shooting, was improperly admitted into evidence as a present recollection refreshed. The State responds that her testimony was properly elicited under that doctrine.

■■ The doctrine of refreshed recollection has been held to permit a witness to refresh his memory by the use of a written memorandum with the only provision that, after looking at the memorandum, the witness can speak to the facts from his own recollection. (*People v. Krauser* (1925), 315 Ill. 485, 146 N.E. 593.) This is so even though the memorandum used to refresh the recollection of the witness is a hospital record. *People v. Greenspawn* (1931), 346 Ill. 484, 179 N.E. 98.

From the record it is clear that the witness did not testify from her own independent recollection, but could only testify from the facts set forth in her report. She repeatedly stated that she had no independent recollection of defendant or the treatment which she administered to him apart from the text of the report. The report was not introduced into evidence. It is also clear that the hospital report did not refresh Odis' memory but that she continued to read from the report and was properly admonished in this regard. While the State might have laid a foundation so as to permit the record to be read into evidence or testified to by the witness, such was not done in the instant case. See *People v. Jenkins* (1973), 10 Ill. App. 3d 166, 294 N.E.2d 24.

However, we are at a loss to find how defendant was prejudiced by the introduction into evidence of Odis' testimony. She testified only that she detected an odor of alcohol about defendant's person subsequent to the shooting and that his head wound required several sutures. Defendant elicited the latter testimony during cross-examination and benefited from her testimony in this regard as it corroborated his account of the assault. Her statement as to the odor of alcohol merely corroborates the testimony of Virginia Chappell and Officer Fitzgerald and its cumulative impact must be deemed negligible.[1]

■■ We note that the prosecution attempted to go further into the area of defendant's tolerance for alcohol and to this end posed the following question to Nurse Odis concerning her treatment of defendant:

"Did you have occasion at the time to ask Mr. Vance about his drinking habits?"

---

[1] Defendant also intimates that Officer Fitzgerald was improperly allowed to testify because his name was inadvertently omitted from the State's list of witnesses. Defendant did not object on this point until the witness initially testified. Defendant subsequently requested and was granted leave of court to re-open his cross-examination of Officer Fitzgerald. Defendant has not demonstrated that he suffered prejudice in this regard.

Defense counsel's proper objection to this question on the grounds of relevance was immediately sustained and the jury was instructed to disregard the question. While the question was inartfully phrased and unduly broad, when read in the context of the entire record and in our estimation, defendant was not substantially prejudiced in this manner. No evidence was adduced to establish or suggest that defendant was an habitual drunkard or that his drinking pattern tended to induce a violent reaction from defendant.

■■ Defendant's second assertion of prejudice arises from the following colloquy between the prosecution and defendant during cross-examination:

"Q. This was the gun you had in the drawer, is that correct?
A. It is.
Q. And you got that gun six months earlier from your grandmother.
A. Yes, I did.
Q. Is that the only gun you had?
Mr. Lee [defense counsel]: Object. What relevancy is that?
Prosecutor: Judge, he said he—
The Court: Overruled.
Q. Is that the only gun you had?
A. No, I have another gun."

In light of defendant's admission that he shot decedent with the weapon previously adduced into evidence, defendant's ownership of an additional firearm is irrelevant.

The State suggests that this line of questioning was necessary to elaborate defendant's testimony on direct examination in which defendant stated:

"Q. Charles, I am going to show you what has been marked as People's Exhibit Number 6. Have you see this gun?
A. Yes. It is mine.
Q. It is your gun?
A. It is.
Q. How long have you had that gun in your apartment?
A. About six months.
Q. And, again where did you keep it in your apartment?
A. In the dresser drawer.
Q. And where did you get the gun?
A. Well, my grandmother owned guns.
Q. And how did you get it from her?
A. My grandmother died in '73 and I believe it was August.
Q. And how long, if you know, had the gun been in your family?
A. Long time. Sixteen years, twenty years, maybe."

The fact that defendant or, indeed, defendant's grandmother might have owned more than one firearm has no legal or logical bearing upon defendant's mental state at the time of the Chappell shooting. In light of the fact that defendant admitted owing one firearm, it might be cogently argued that testimony regarding an additional firearm would not, of itself, operate to defendant's prejudice in a manner not already of record. The State, however, admits in its brief that its questioning was "intended to establish that the defendant had a number of means at his disposal by which to vent his propensity for violence towards Jesse Chappell." The rules of evidence concerning legal relevance are designed to exclude just such testimony. This line of questioning at issue was improper but not sufficient to require reversal of defendant's conviction.

Defendant also complains that certain remarks of the prosecution to the jury during the course of its closing argument were improper and served to deny defendant a fair trial.

■■ Defendant's initial claim of prejudice arises from the following remarks made by the prosecutor during the opening segment of his closing argument:

> "Right after that we hear a series of shots, three shots, and Virginia said, I was stunned and I got up and I went outside and I saw my husband and I saw Charles Vance and struggling with a gun and fell down and went up and looked at my husband and said, 'You killed my husband.' What did Charles Vance say? Charles Vance took this gun which you can take back, it is in evidence, with you, he took this gun and he put it at her head. He said, 'I'm going to kill you, too, bitch.' She said, 'You killed my husband,' and he took this gun and pointed it at Virginia. Said, 'I'm going to kill you, too.' "

There is no direct evidence that defendant pointed the gun at Virginia Chappell's head but her testimony established that defendant was armed, held the gun in the air, and threatened to shoot her. The inference that defendant emphasized his threat by pointing the firearm in the direction of Virginia Chappell's head would be a reasonable one. In any case, defendant made no objection to this comment by the prosecution.

■■ Defendant also contends that he was unduly prejudiced by the prosecutor's comment during rebuttal argument upon defendant's failure to call a doctor to testify as to the severity of his head wound or to subpoena "Al" to establish that defendant was not intoxicated during that time defendant allegedly spent in his company.

It would appear that the prosecution's comments fall within the ambit of *People v. Blakes* (1976), 63 Ill. 2d 354, 359, 348 N.E.2d 170, 173-74, wherein it was noted:

> "[A] jury in its deliberations is not limited to a consideration of

that which is, strictly speaking, testimony. To the contrary, it may properly consider any facts developed in the trial from which a reasonable inference may be drawn for or against either party. For instance, if it is developed in a trial that a witness exists, presumably under the control of a defendant, who can throw light upon a vital matter, and he is not produced, certainly a jury may fairly consider that fact, and, likewise, counsel would have a legitimate right to comment thereon. * * *

[I]t is our conclusion-that though failure to call a witness or produce evidence may not be relied on as substantial proof of the charge, nonetheless, if other evidence tends to prove the guilt of a defendant and he fails to bring in evidence within his control in explanation or refutation, his omission to do so is a circumstance entitled to some weight in the minds of the jury, and, as such, is a legitimate subject of comment by the prosecution."

Here, too, the prosecutor was referring only to the obvious in commenting that the defense had not produced "Al" or any medical testimony, although Nurse Odis did testify that defendant's wound was of a sufficiently severe nature as to require several sutures. No error was introduced into the record in this regard and the jury was properly instructed as to the law and the State's burden of proof thereunder.

■■ Defendant also contends that he was denied a fair trial by the prosecutor's reference to defendant's level of intoxication in the early evening preceding the shooting. The remarks complained of are as follows:

"You heard he was drunk.

You heard how he had to apologize. Mr. Chappel made him apologize earlier that day. And Mr. Chappel may have pushed him. I don't know. I suspect he probably did. This is four or five hours earlier, before the shooting. He is sitting in that room, probably getting drunker, sees Jeese * * *."

It is unclear, on its face, as to which room the prosecutor was making reference. As an abstract proposition, defendant may have become "drunker" after the afternoon altercation due to the effect of additional alcohol ingested into his system or due to the effect of alcohol already in his bloodstream. The testimony established that defendant, in all likelihood, had consumed more alcohol than he admitted under oath. Even if we were to consider the remark improper, we conclude that it would have been harmless given the trial court's prompt action in sustaining the objection and the other competent evidence of defendant's guilt.

■■ Defendant finally contends that his sentence was excessive in light of his age (52 years) and the length of time between his conviction

for the instant offense and his previous felony convictions (*i.e.*, one in 1944 for assault with a deadly weapon; and a second in 1949 for automobile theft).

Defendant was sentenced to serve a sentence of 6 years, 8 months to 20 years in the Illinois State Penitentiary upon his conviction in the death of Jesse Chappell. Pursuant to section 3—3—3 of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1003—3—3(a)(1)) defendant will be eligible for parole after 6 years, 8 months, less time credited to his sentence for good behavior. According to established guidelines, such a reduction would make defendant eligible for release in approximately 4 years, 9 months. See Admin. Reg. of the State of Illinois, Dept. of Corrections, Adult Div., §813.

The sentence imposed is sufficiently indeterminate to prove an incentive for defendant's possible rehabilitation while the minimum term reflects the gravity of the instant offense and should remain undisturbed on appeal.

The judgment is affirmed.

Affirmed.

PERLIN and PUSATERI, JJ., concur.