THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LESTER WEATHERSPOON, Defendant-Appellant.

First District (5th Division)    No. 77-1258

Opinion filed August 4, 1978.

Lawrence Wolf Levin, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, J. Jonathan Regunberg, and Paul C. Gridelli, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant, Lester Weatherspoon, was charged by indictment with three counts of murder and one count of attempt armed robbery, for the shooting of a grocery clerk in the course of robbing a small neighborhood food store. A jury found defendant guilty of both murder and attempt armed robbery, and defendant received concurrent sentences of 25 to 50 years for the murder and 6 to 20 years for the attempt armed robbery. On appeal, defendant contends that: (1) he was denied a fair trial due to certain comments made by the prosecutors during closing argument; and

(2) the identification linking him to the crime was insufficient to establish his guilt beyond a reasonable doubt.

We affirm. The pertinent facts follow.

Carmelo Flores, whose nickname is "Gino," testified that he had owned Gino's Food Mart since 1965. The grocery is on the first floor of a building located on the northeast corner of Ohio and Trumbull Streets in Chicago, Illinois. Flores and his wife live on the second floor of the building. Flores described the store as being about 25 feet wide by 25 feet deep, with the entrance at the corner of Ohio and Trumbull. To the right of the entrance is an ice-cream chest that serves as a counter. The cash register is on the chest, and behind it is the drug department and room for the cashier. A produce and dairy case is to the left of the entrance. Shelving runs down the center of the store from front to back, forming an aisle on either side. At the back of the store is a meat department. The store is lit with eight-foot long fluorescent lights.

On December 1, 1973, Flores was working at the grocery along with his wife, Maria, who was the cashier, Raymundo Delvalle, who was a butcher, and Alberto Luna, a stock boy who was helping Mrs. Flores bag groceries at the cash register. Shortly before 6 p.m. on that day, Flores was about 20 feet from the store's entrance, in the left-hand aisle, when two men entered the store, carrying guns and announcing a holdup. Mrs. Flores and Alberto Luna were behind the cash register and Delvalle was working in the meat section with his back to the front of the store. One of the men began to kick Alberto Luna and called for Flores to come to the front of the store. Flores ran to the back of the store and pulled on the door. He grabbed his gun, took the chain off the door and then heard a shot. The event took approximately 45 seconds.

Flores went out the rear door and ran to the store's front entrance. He saw the two men running south on Trumbull, crossing from the east side of the street to the west side. Flores ran after them briefly, firing two shots in the air. Flores admitted that he could not identify either of the men.

Maria Flores testified that she had known Alberto Luna for about five years and that he had been working at the grocery for about a month as of December 1, 1973. On that day, shortly before 6 p.m., Delvalle, Mrs. Flores' cousin, was slicing bacon in the meat department and her husband was cleaning some shelves on the left-hand side of the store. Mrs. Flores was working at the cash register and Alberto Luna was bagging groceries when Mrs. Flores saw the defendant standing right in front of her, pointing a gun directly at her. A second man stood in front of Alberto Luna, pointing a gun at him. Mrs. Flores recognized the defendant, having seen him before, and exclaimed, "Again!" in Spanish.

The defendant told Mrs. Flores to lie down on the floor, and she lay on the floor, head to head next to Alberto Luna, behind the counter.

Defendant told Mrs. Flores to get up, grab a bag, and put the money in it. Defendant was leaning over the counter with his arm extended, still pointing the gun at Mrs. Flores as she slowly got up. The second man continued to kick Alberto Luna, who was still on the floor, and then told defendant to shoot Mrs. Flores. Defendant was at that time standing in front of Mrs. Flores with the gun aimed at her, about a foot away from her head. Upon hearing the second man's order for defendant to shoot, Mrs. Flores put her hands in front of her face, fell backwards and heard a shot. She got up slowly, looked around and saw Alberto Luna on the floor, bleeding from his head. Mrs. Flores began to scream and cry, closed and locked the front door of the store, and ran around the store screaming and crying.

Mrs. Flores talked with the police after they arrived and looked at some photographs they showed her, but didn't recognize anyone from them. The following day the police came over with two books of photographs and Mrs. Flores identified a picture of defendant. Two weeks later she was shown six pictures and again selected a picture of defendant, the latter being a more recent picture than the first one she had chosen. At the trial, Mrs. Flores identified both pictures of the defendant which she had previously identified, and also identified defendant himself.

Mrs. Flores testified that she had seen defendant previously on November 17, 1973, in the grocery store. At that time, defendant and another man held Mrs. Flores at gunpoint, ordered her to fill a paper bag with money, and told her to lie down on the floor, enabling them to escape with $800. On cross-examination, Mrs. Flores testified that she had not signed a complaint against defendant for that incident, nor had she ever given any testimony in court regarding it. She said she had described defendant to the police as approximately 19 years old, with a medium complexion, and about an inch shorter than her husband, who is 5'6" tall. She further testified that she did not recall describing defendant at that time as a light-complected male Negro, 16 to 18 years old, 5'4" tall and weighing about 130 pounds. Mrs. Flores did recall then telling the police that she would not be able to identify either one of the men. She estimated that the November 17 incident took about two minutes.

When cross-examined regarding the December 1, 1973, shooting, Mrs. Flores stated that she was sure the two men were the same ones who had robbed her on November 17. She said defendant was the taller of the two men and had described him as being about 18 or 19 years old and almost an inch shorter than her husband. Mrs. Flores testified further that she did not say defendant was 6'1" tall, and did not recall ever describing him as being that height with a dark complexion and weighing 150 pounds. Mrs. Flores described the second man as a little taller than she, with a light

complexion and wearing an "Afro" hair style, and between 16 and 18 years old.

Mrs. Flores testified that on December 1, 1973, she spoke to some detectives at the police station after the robbery and shooting. She was given two or three books of pictures and told to look and see if any of the pictures were of the men in her store that evening, but picked out no pictures at that time. The following day some plainclothes officers came to her home and she looked at "books and books" of pictures, picking out one picture, but not making a positive identification. Mrs. Flores had asked the name of the person pictured but did not recall receiving an answer. On December 14, 1973, Mrs. Flores again looked at more pictures, this time selecting another picture of the defendant. She said she knew defendant's name by that time but did not know if his name was on the back of the picture on December 14, and did not recall if she had seen the back of the picture.

Mrs. Flores further testified that the shooting incident on December 1 took no more than a minute, but upon detailed questioning on cross-examination she said she was face to face with defendant for about 45 seconds before lying on the floor for 20 seconds. She faced defendant for another 45 seconds before he was told to shoot her. She did not see the shot being fired but heard the trigger above her head. On redirect, Mrs. Flores said the times were all approximations. She also said she had testified about the November 17 incident at the preliminary hearing held in the instant case.

Raymundo Delvalle and two of the Flores' neighbors also testified regarding the shooting but all were unable to make any identification of the assailants.

Officer Paul Bretz of the Chicago Police Department testified that he responded to the robbery call on December 1, 1973, and upon entering the Flores' grocery store saw a man lying on his stomach behind the counter, bleeding and apparently shot in the head. Bretz called for first aid and transportation to the hospital for the victim. He described Mrs. Flores as "very pale" and upset, "in shock." She did not respond to questions, Bretz said, and he felt Mrs. Flores didn't fully understand what he was asking and that most of the time he had to "almost put words in her mouth." Bretz spoke to Mrs. Flores off and on during the hour and 15 minutes he was at the store. The only description he received from Mrs. Flores that night was that of "two male Negroes," and the description was too vague to send a "flash message." Bretz testified that Mrs. Flores did not tell him that the two men were the same ones who robbed her on November 17. He and his partner had taken report information from Mrs. Flores on November 17, and Bretz had signed it. The description

obtained from Mrs. Flores at that time was also too vague to send a flash message. Bretz also testified that he had no authority to approve charges to be brought against a defendant and that it is not his job to conduct investigations, interview all witnesses, or apprehend the offender.

Officer John Dahlberg of the Chicago Police Department testified that he had been assigned to investigate the December 1, 1973, robbery and shooting at the Flores' store the day after the incident occurred. He spoke to Mrs. Flores at her store and showed her a series of 10 to 15 photographs. Mrs. Flores had selected one picture, a 1968 photograph of defendant, and tentatively identified it as a picture of the man who robbed her and shot Alberto Luna. Dahlberg did not seek an arrest warrant for defendant on December 2 because the identification was not definite. The investigator made a report as a result of his conversation with Mrs. Flores. He did not recall getting a description of the assailants from Mrs. Flores and did not ask her for one because the robbery report contained a description. The description, of a male Negro, 6'1" tall, between 17 and 19 years old and with a light complexion and bulging eyes, was used on his own report. Dahlberg had no knowledge of the November 17, 1973, robbery and never received a description from Mrs. Flores on that case.

Investigator Lee R. Anderson of the Chicago Police Department had been assigned to investigate Alberto Luna's death. On December 14, 1973, Anderson went to the Flores' store and showed Mrs. Flores five pictures. She identified one picture as of the man who shot Alberto Luna, but recognized no others. Upon being shown the five pictures he had shown Mrs. Flores, Anderson selected the picture of defendant as the one Mrs. Flores had chosen. Following the photo identifications by Mrs. Flores, Anderson had returned to his office with his partner. He then made out a report and contacted the State's Attorney's Office to request that they obtain a warrant for defendant's arrest. Defendant was arrested on January 10, 1974, but Anderson was not involved in it or notified of it.

Anderson further testified that the names were not on the backs of the pictures when he showed them to Mrs. Flores and that he did not recall telling Mrs. Flores defendant's name. Anderson had asked Mrs. Flores about her earlier photo identification after she had looked at the pictures on December 14. Mrs. Flores had said that she had seen a picture of the same man, although it was an older picture and she hadn't been sure of the identification at the time. The picture Mrs. Flores identified during Anderson's visit had been taken in early 1973. Anderson had never ordered a lineup identification and did not know if one was ever held.

Lulu Belle Weatherspoon, defendant's mother, testified for the defense that on November 17, 1973, defendant was "home all day, all night," because there was a surprise party given for him that night. Defendant

found out about the party and stayed home, helping to clean the basement and decorate, and taking a nap in the afternoon. The party began at about 8 p.m. and lasted until 11 p.m. or midnight. It was a small party and Mrs. Weatherspoon did not recall who was there. She knew defendant had never left the house that day because there is only one usable door to their home and she has the only key and must let everybody in or out.

Mrs. Weatherspoon did not know where defendant was on December 1, 1973. On cross-examination, however, she testified that defendant had been playing ball in the alley that day, but she did not watch him. He was around the house, she said, although not in her immediate presence.

Defendant testified in his own behalf that he was 25 years old, 5'4" tall, and weighed 115 pounds. On November 17, 1973, he was at home between 4 p.m. and 8 p.m. and on December 1, 1973, he had gone to the neighborhood in which he formerly lived, but could not recall his exact whereabouts on that date. He also testified that he had been convicted once for robbery, a felony.

On cross-examination, defendant stated that before 5 p.m. on December 1, 1973, he had been playing ball with friends in the alley behind his house, but he did not know the friends' names. Between 5 p.m. and about midnight on that date he was in the area of Kedzie and Polk Streets, both on the street and inside buildings, arriving there "after 5:00 p.m." Defendant further testified that he remembered no specific activities that night. He did visit a friend named Neal Ramsey, who lived at Kedzie and Arthington, and there were two other persons present. He also visited a friend named Gloria Jean, at Kedzie and Polk, while her mother was present. Defendant had not been in touch with either Ramsey or Ms. Jean since his arrest and he had never attempted to contact anyone he was with on December 1, 1973.

Defendant stated he was arrested at home on January 10, 1974, by four police officers who told him he was charged with a murder which had occurred on December 1, 1973. He did not ask them any questions or say anything to them of his whereabouts on December 1. He also identified the pictures chosen by Mrs. Flores as pictures of himself.

The defendant then rested.

The State presented investigator Stan Thomas of the Chicago Police Department as a rebuttal witness. Thomas and his partner arrested defendant on January 10, 1974. Thomas testified that he had advised defendant of his rights and of the charges against him, including the date and location of the shooting, but not the specific time. Defendant had denied the charge and had told Thomas that he had been at home all day on December 1, 1973.

Following the testimony of the witnesses, it was stipulated that Alberto

Luna had been pronounced dead on December 2, 1973, the cause of death being a bullet wound at the back of the head and brain. The court admitted into evidence the 1968 and 1973 photographs of defendant, originally identified by Mrs. Flores. Also admitted was the group of five pictures from which Mrs. Flores had selected the 1973 picture of defendant. The pictures were allowed to go to the jury, with date and height markings excised from them.

After receiving instructions and hearing closing arguments, the jury found defendant guilty of murder and attempt armed robbery.

OPINION

Defendant first contends that he was denied his constitutional rights to due process and a fair trial because of allegedly prejudicial comments made by the prosecutor during closing arguments. In support of this contention, defendant maintains that the prosecutor tendered statements of facts not in evidence, charged defense counsel with attempting to trick and confuse the jury, and likened the case to the Richard Speck murder case, thereby arousing the prejudices of the jury.

In considering defendant's arguments, we first note that a prosecutor is allowed a great deal of latitude in making the closing argument (see *People v. Franklin* (1976), 42 Ill. App. 3d 408, 421, 355 N.E.2d 634), and the trial court's determination of the propriety of the closing argument will generally be followed absent a clear abuse of discretion. (*People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324.) It has been held to be impractical to lay specific guidelines for proper argument to the jury (*People v. Gilmore* (1969), 118 Ill. App. 2d 100, 254 N.E.2d 590, *cert. denied* (1970), 400 U.S. 845, 27 L. Ed. 2d 81, 91 S. Ct. 89), and each case must thus be decided on its own facts. *People v. Bigsby* (1977), 52 Ill. App. 3d 277, 367 N.E.2d 358.

■■■ Defendant, in contending that the prosecutor argued facts not of record, cites eight instances which merely contained the prosecutor's argument regarding what the testimony showed. Each of the cited instances contained a statement made in direct response to defense counsel's arguments to the contrary. Both parties have a right to comment on the evidence and to draw any legitimate inferences therefrom (*People v. Fleming* (1975), 36 Ill. App. 3d 612, 621, 345 N.E.2d 10), even if the inferences may be to the detriment of the defendant. (See *People v. Gilmore; People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634.) Arguments may be made in response to defendant's closing argument. (*People v. Coleman* (1977), 51 Ill. App. 3d 499, 366 N.E.2d 1026.) Moreover, unintentional misstatements of fact do not in themselves constitute prejudicial error. (*People v. Kitchen* (1977), 53 Ill. App. 3d 521, 368 N.E.2d 528.) The prosecutor prefaced his rebuttal argument with a

statement that his argument is not testimony, and each of defendant's objections were followed by an instruction to the jury that it was to recall the evidence. The trial court's actions were clearly consistent with the rule that the jury is the arbiter of the facts in the case (see *People v. Pecora* (1969), 107 Ill. App. 2d 283, 246 N.E.2d 865), and no prejudice to defendant resulted from those statements.

Defendant in particular claims that he was prejudiced by the following statements of the prosecutor made in his rebuttal argument:

"Again, ladies and gentlemen, remember the evidence. What did Anderson tell you? He went to the community. He went and he got the photo. He immediately took the photos, all five of the photos, he went to Maria Flores, he showed them the pictures and he told you under oath with his reputation, with his entire experience as a police officer—

MR. LEVIN [defense counsel]: I object to characterization."

■■ Defendant argues the impropriety of the reference to the reputation of the witness. Although there is no evidence in the record of Anderson's reputation, this reference was made in response to defense counsel's suggestion in his closing argument that, contrary to the testimony of the witness, defendant's name was written on the back of the photograph when Mrs. Flores positively identified it. The credibility of a witness may be discussed in the prosecutor's closing argument. (*People v. Franklin* (1976), 42 Ill. App. 3d 408, 422, 355 N.E.2d 634.) Furthermore, defense counsel having implied in his closing argument that the witness' testimony was untrue, he cannot complain that the prosecutor's response to that argument prejudices defendant. *People v. Coleman* (1977), 51 Ill. App. 3d 499, 366 N.E.2d 1026; *People v. Kelly* (1975), 25 Ill. App. 3d 753, 324 N.E.2d 82.

The cases cited by defendant are distinguishable. In *People v. Patterson* (1976), 44 Ill. App. 3d 894, 358 N.E.2d 1164, the court reversed an armed robbery conviction where the prosecutor, over sustained objections by defense counsel, repeatedly referred to the defendant's "various" previous convictions without any basis in the record, and made other repeated prejudicial comments which indicated an intentional disregard for the rulings of the trial court. In *People v. Dukes* (1957), 12 Ill. 2d 334, 146 N.E.2d 14, the court vacated a death sentence, although not its underlying murder conviction, finding that it was especially improper and highly prejudicial for the prosecutor to refer to his knowledge of the good qualities of the deceased, even if it was innocently done.

■■ In the instant case, the prosecutor's argument responded to defense counsel's argument which questioned the credibility of the witness. Moreover, the nature of the reputation of the witness was never related to the jury, the objection to the statement was immediately sustained, and

the jury was instructed to disregard the comment. Any prejudice that could have arisen was thus removed by the court's prompt action. See *People v. Farmer* (1963), 28 Ill. 2d 521, 192 N.E.2d 916.

■■ The defendant also claims to have been prejudiced by the characterization of defense counsel's argument as a "smoke screen," a "snow job," and an attempt to confuse the jury. Each statement was met by an objection which was sustained by the court, which then instructed the jury to disregard the comments. Such comments on their own do not constitute reversible error. (*People v. Smith* (1977), 53 Ill. App. 3d 395, 368 N.E.2d 561.) We have examined the context in which the above statements were made and find that they do not amount to an accusation that defense counsel fabricated a defense and encouraged defendant to testify accordingly. (See *People v. Freedman* (1954), 4 Ill. 2d 414, 123 N.E.2d 317.) Rather, the arguments were more in the nature of responses to defense counsel's arguments. While such comments are not to be condoned, the comments made in the instant case were not of such magnitude as to require a reversal. (*People v. Palmer* (1970), 47 Ill. 2d 289, 265 N.E.2d 627, *cert. denied* (1971), 402 U.S. 931, 28 L. Ed. 2d 866, 91 S. Ct. 1532.) The statements did not in any way deny defendant a fair trial (*People v. Weaver* (1972), 7 Ill. App. 3d 1104, 288 N.E.2d 669), and therefore resulted in no prejudice against defendant.

■■ Defendant maintains further that he was prejudiced by the following remarks:

> "MR. O'MALLEY [prosecutor]: There is no courthouse rule, you will get no instruction, you will have no instructions from his Honor that you cannot find this man guilty on one eyewitness.
>
> Ladies and gentlemen, I would suggest to you that the jails are filled with people convicted on one eyewitness, one eyewitness can't prove this case, gee, let's tell Richard Speck that.
>
> MR. LEVIN: Objection, make a motion for a mistrial at this time.
>
> THE COURT: I would sustain the objection, ask the jury to disregard. Deny your motion for a mistrial. You may continue with your argument."

Although the prosecutor may not make statements solely to inflame the passions or arouse the prejudices of the jury (see *People v. Heidman* (1957), 11 Ill. 2d 501, 144 N.E.2d 580), there is no prohibition to referring to well-known cases in closing argument. In *People v. Lion* (1957), 10 Ill. 2d 208, 139 N.E.2d 757, the court held that it was not prejudicial error for the prosecutor, in commenting upon character testimony for defendant, to state that "Alger Hiss, the convicted communist, had some perfect testimonials." (10 Ill. 2d 208, 216.) Similarly, in *People v. Veal* (1978), 58 Ill. App. 3d 938, 374 N.E.2d 963, it was held that no reversible error occurred where the prosecutor had likened the defendants to well-known

killers, and an objection was immediately sustained and the jury instructed to disregard the comment.

■■ The reference in question here is not one of the same magnitude as those in *Lion* and *Veal,* for no personal comparison was made between defendant and Richard Speck. Instead, the comment was made in response to defense counsel's argument and was directed toward demonstrating that the testimony of one eyewitness is sufficient to convict a defendant of murder. The fleeting reference to Richard Speck, coupled with the trial court's action in immediately sustaining defendant's objection and instructing the jury to disregard the reference, did not prejudice defendant.

We have examined in detail the final arguments by the prosecutors as well as by defense counsel. While many statements would have better been left unsaid, they were not of such a nature as would result in substantial prejudice (*People v. Nemke* (1970), 46 Ill. 2d 49, 263 N.E.2d 97), or would require a different verdict. (*People v. Hines* (1964), 30 Ill. 2d 152, 195 N.E.2d 712.) Moreover, the trial court promptly considered the objections of defendant and immediately instructed the jury according to its rulings, thus minimizing any prejudice that may have resulted from the prosecutor's statements. *People v. Farmer* (1963), 28 Ill. 2d 521, 192 N.E.2d 916; *People v. Vance* (1977), 53 Ill. App. 3d 573, 368 N.E.2d 758.

There has been no showing that any of the remarks questioned by defendant influenced the jury and resulted in substantial prejudice (*People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881); that the remarks were a material factor in defendant's conviction (*People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363; *People v. Lewis* (1976), 38 Ill. App. 3d 995, 349 N.E.2d 528); that they were so inflammatory as to deprive defendant of a fair trial (*People v. Murdock* (1977), 50 Ill. App. 3d 198, 365 N.E.2d 1301); or that the verdict would have been different had the comments not been made. (*People v. Trice* (1970), 127 Ill. App. 2d 310, 262 N.E.2d 276.) We therefore conclude that no prejudicial error resulted from the prosecutor's argument. See *People v. Mackins* (1974), 17 Ill. App. 3d 24, 308 N.E.2d 92, *appeal denied* (1974), 56 Ill. 2d 584, *cert. denied* (1975), 419 U.S. 1111, 42 L. Ed. 2d 808, 95 S. Ct. 786.

Defendant next contends that the identification linking defendant to the crime was insufficient to constitute his guilt beyond a reasonable doubt. Defendant maintains that the identification is inadequate because of the short time Mrs. Flores, the sole eyewitness, saw the assailants, because defendant introduced alibi testimony regarding the first date Mrs. Flores had seen the assailants, and because the description in certain police records conflicts with the actual characteristics of the defendant.

■■ When the identification of a defendant is at issue, the testimony of

one credible witness, who viewed the defendant under such circumstances as would permit a positive identification, is sufficient to convict, even if the defendant contradicts such testimony. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313; *People v. Davis* (1977), 53 Ill. App. 3d 424, 368 N.E.2d 721.) The trier of fact determines the credibility of the identification witnesses and the weight to be given to their testimony. See *People v. Collins* (1977), 53 Ill. App. 3d 114, 368 N.E.2d 685; *People v. Lumpkin* (1975), 28 Ill. App. 3d 710, 329 N.E.2d 262.

Mrs. Flores testified that the defendant and another man entered her store on December 1, 1973, and held her and Alberto Luna, the deceased, at gunpoint. Mrs. Flores exclaimed "Again!" in Spanish, referring to the fact that the store had been robbed on November 17, 1973, by the man pointing the gun at her, whom she later identified as defendant. Mrs. Flores continued to view defendant's face as he ordered her to lie on the floor and as she rose to get a bag for the money, as defendant instructed. Defendant was approximately one foot away from her, in a store lit with eight-foot long fluorescent lights. Mrs. Flores observed the defendant for approximately one minute before he and his companion ran from the store after shooting Alberto Luna.

On the night of December 1, Mrs. Flores was unable to give a detailed description of the assailants, and could not identify any photographs from albums she was shown at the police station. The following day, upon being shown more photographs at home, she selected a five-year-old picture of defendant as strongly resembling the man who shot Alberto Luna. She also said he was the same man who had robbed her on November 17, 1973. On December 14, 1973, Mrs. Flores positively identified defendant as the man who shot Alberto Luna, choosing a recent picture of defendant from a group of five photographs.

Mrs. Flores had given the police a description after the first robbery on November 17, 1973, at which time she had observed the offender for 30 seconds to one minute. Mrs. Flores testified as to the description she gave to the police at that time. The description was fairly close to that of the defendant.

Defendant maintains that there is a discrepancy between the descriptions Mrs. Flores gave at trial and the description on a report of the December 1, 1973, incident. That report describes the offender as a 6'1" male Negro. The defendant is 5'4" tall. Mrs. Flores, however, never wavered in her description of the assailant as approximately an inch shorter than her 5'6" tall husband. She denied ever having described the offender as 6'1" tall. Moreover, the source of the 6'1" description was never disclosed. The sole testimony concerning its origin was that the investigator for the December 1, 1973, incident copied it from a

previously submitted report and that he had not received that identification directly from Mrs. Flores.

Defendant argues further that defendant's name was on the back of the picture shown to Mrs. Flores on December 14, 1973. However, although defendant's name was on the back of the photograph when it was introduced at trial, Mrs. Flores did not recall seeing the back of the picture at the time she made the identification, and the officer who showed her the photographs testified that the name was not on the picture at the time.

■■ Defendant also maintains that the alibi testimony regarding November 17, 1973, created a reasonable doubt as to his connection with the December 1, 1973, shooting and robbery. Defendant's mother corroborated his testimony that he was at home all day on November 17, 1973. Defendant testified that he was visiting friends on December 1, 1973, but his mother did not know his whereabouts on that date, and none of the friends defendant claimed to have visited on that day testified at trial. The weight of this testimony was properly left to the determination of the jury.

■■ Mrs. Flores observed the defendant twice, at very close range and under good lighting conditions. Her testimony as to the descriptions she gave of defendant never changed, even under cross-examination. She identified the defendant from photographs, first tentatively identifying him from an older picture, then positively identifying him from a more recent picture. Mrs. Flores also positively identified defendant at trial. There has been no showing that the photograph identification procedure was so suggestive as to raise a substantial likelihood of misidentification at trial. (*Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967.) We therefore find that the identification was not so uncertain as to create a reasonable doubt of the defendant's guilt. *People v. Capon* (1961), 23 Ill. 2d 254, 178 N.E.2d 296; *People v. Bounds* (1976), 36 Ill. App. 3d 330, 343 N.E.2d 622.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.