2020 IL App (2d) 170795-U
No. 2-17-0795
Order filed May 7, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-130 |
| JAMES T. ABRON, | ) ) | Honorable Randy Wilt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Hudson and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court erred in allowing the State to elicit inadmissible hearsay testimony from the emergency room doctor. However, the remaining evidence presented was sufficient to affirm defendant's conviction of aggravated domestic battery.

¶ 2    After a bench trial, defendant, James Abron, was convicted of aggravated domestic battery and domestic battery. He was sentenced to 180 days in jail and 48 months' probation. Defendant appeals, contending that the trial court erred by allowing the State's expert witness to testify about viewing an x-ray allegedly depicting the victim's broken ankle, as well as treatment administered to the victim.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was arrested on January 19, 2016, and charged by complaint with one count of aggravated domestic battery. Subsequently, a grand jury indicted defendant on one count of aggravated domestic battery (720 ILCS 5/12-3.3 (West 2016)) and one count of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)). The indictments alleged that defendant knowingly caused either bodily harm or great bodily harm by stepping on and breaking the victim's ankle.

¶ 5      On April 25, 2017, the State filed a motion in *limine* seeking to admit hearsay statements concerning the victim's medical diagnoses and treatment under Illinois Rule of Evidence 803(4). The State alleged that the victim had been admitted to Rockford Memorial Hospital on January 16, 2016, and reported pain caused by injuries sustained from her ankle being stepped on two days prior.

¶ 6      The matter proceeded to trial on May 2, 2017. Dr. Jane Kotecki, an emergency medicine physician at Rockford Memorial Hospital working in the emergency room on January 16, 2016, was called to testify. Just prior to her testimony, the trial court granted the State's motion in *limine* concerning her testimony, stating that "statements made for the purposes of medical diagnosis or treatment are an exception to the hearsay rule, so I will allow it."

¶ 7      The trial court accepted Dr. Kotecki as an expert in emergency medicine. Under direct examination by the State, she testified that she encountered the victim, M.B., during the early morning hours of January 16, 2016, while working in the ER at Rockford Memorial Hospital. M.B. said that her ankle was stepped on by another person and complained of pain in that area. Kotecki ordered an x-ray of M.B.'s ankle. Defense counsel then objected as to foundation and the following exchange took place with the trial court:

"[DEFENSE COUNSEL]: Judge, I'm going to object as to foundation.

THE COURT: What's your foundational objection?

[DEFENSE COUNSEL]: As to how she came to be able to view an x-ray, to determine that it was an x-ray regarding her ankle to make a diagnosis.

THE COURT: All right. I'll sustain the objection. I just want a little more information: Did she take the x-ray, who took the x-ray, if somebody else took the x-ray, how did it come into her possession, how was she aware that it was the x-ray of this person. If you could lay that foundation."

The State then had the following exchange with Dr. Kotecki:

"Q. When you were treating [M.B.], did you ask that an x-ray be completed?

A. Yes.

Q. Are you aware of who would have done that x-ray?

A. No.

Q. Is your - - how did you come to be in possession of her x-ray?

A. X-rays are posted on our computer monitor with the patient's name on them for us to view.

Q. And when you viewed this x-ray, did it have [M.B.]'s name on it?

A. Yes."

Defense counsel again objected as to foundation for Kotecki's answers. The trial court overruled the objection. Kotecki was then asked by the State if she had observed any injury to M.B. when reviewing her x-ray. Defense counsel again objected and stated "Judge, I'll just make a continuing objection due to foundation, that I don't believe it's been laid for this opinion." The trial court

acknowledged that defendant's objection was on the record. Kotecki then testified that she diagnosed a fracture of her distal fibula. She placed M.B. "in a posterior mold, which is a form of a splint, and [gave] prescriptions for pain medicine and crutches."

¶ 8     On cross-examination, defense counsel had the following exchange with Kotecki:

"Q. And I'm sorry, Doctor, you stated what time did you see this patient?

A. It was in the early morning hours. I don't remember.

Q. As you sit here today, do you have a personal recollection of [M.B.]?

A. No.

Q. And *** you took a history from her, correct?

A. Yes.

Q. And in that history did she indicate when the onset of pain manifested itself?

A. I believe it was a couple of days earlier.

Q. And you testified regarding the x-rays, was that from memory or was that ***

in the ordinary course of your practice that you would've viewed the x-ray?

A. Ordinary course of my practice I would've viewed her x-ray.

Q. But sitting here today, do you remember physically viewing that x-ray?

A. No."

¶ 9     On redirect examination, the State and Kotecki engaged in the following exchange:

"Q. When you see a patient, is there any way that you document that interaction?

A. Yes.

Q. What do you do to document that interaction.

A. Charting.

Q. *** What do you list in a chart?

A. History, physical, medications, diagnosis.

Q. Does that include the patient's name, date of birth, physical appearance, things like that?

A. Yes.

Q. Does it include any statements that were made to you by a patient or their history?

A. Sometimes, yes.

Q. And would that also include a documentation of the injuries, diagnosis and treatment?

A. Yes.

Q. And did you do that in this case with [M.B.]?

A. Yes.

Q. And did you review that prior to your testimony today?

A. Yes.

Q. And is that what you base your recollection on of your testimony today?

A. Yes.

Q. And when you make a chart, is that done at or around the time of your treatment of that patient?

A. It depends. Sometimes, sometimes not."

Neither M.B.'s treatment chart or x-ray was offered into evidence.

¶ 10    M.B. was next to testify for the State. She testified that on the date of the alleged incident she had been in a relationship with the defendant for eight years. They lived together at a residence in Rockford with her daughter and defendant's two sons. On the evening of January 14, 2016, and the early morning hours of January 15, 2016, M.B. and defendant were at the residence drinking. They then got into an argument about defendant being in the bathroom with M.B.'s 12-year old daughter. The argument began in the kitchen and proceeded into a hallway leading from the kitchen to the dining room. M.B. testified that defendant pushed her to the floor and stepped on her ankle. When she tried to get up, he pushed her to the ground again. She stated that defendant then made a motion as if he were about to punch her but stopped upon M.B.'s daughter pleading with him to stop. She next testified that she had to hop into the bedroom due to the pain in her ankle. She then asked her daughter to retrieve the house telephone as there was no cell phone available, but it could not be found. M.B. said that she then asked defendant where the phone was located, but he just looked at her. M.B. stayed in the bedroom for the remainder of the evening while defendant stayed in a bedroom upstairs.

¶ 11    M.B. testified that the following evening of January 15, 2016, a deputy with the Winnebago County Sheriff's Department arrived at the residence to serve an order of protection filed by defendant. They deputy drove her to the home of defendant's brother. M.B. said that this was her first opportunity to make a phone call since suffering her ankle injury. She phoned her mother who told her "to call the ambulance and go to the hospital and make sure to see what's wrong with it." M.B. called an ambulance and was transported to Rockford Memorial Hospital in the early hours of January 16, 2016. She testified that x-rays were performed and an "aircast or air boot" was placed on her ankle and remained for approximately three months. She described her ankle as

"swollen" and that she had a lot of pain when taken to the hospital. She also reported bruising on her arm. The trial court then admitted People's Exhibits 1, 2, and 3 into evidence. The photographic exhibits depicted injuries to M.B.'s ankle and arm taken on January 16, 2016, while at Rockford Memorial Hospital.

¶ 12    On cross-examination, M.B. admitted to drinking "coolers" on the evening of January 14, 2016, but stated that she was not intoxicated. She also admitted to throwing a skillet of food into the sink after beginning to argue with defendant in the kitchen.

¶ 13    Officer Jeremiah Hedlund of the Rockford Police Department was next called to testify by the State. Hedlund stated that he was working as a Rockford police officer on January 16, 2016, when he was called to Rockford memorial hospital in reference to a possible domestic violence victim. Upon arrival he met with M.B. in her hospital room where she was laying in bed. He described M.B. as having "a bruise on her left arm and one of her ankles was swollen." People's Exhibits 1, 2, and 3 are photographs he took of her injuries. He then remarked on cross-examination and redirect examination that he recalled M.B. stating that defendant either stepped or stomped on her ankle during their altercation.

¶ 14    The State then rested. Defendant testified on his own behalf. Defendant testified that M.B. had been drinking alcoholic beverages on the night in question. He said that he observed her to be swaying and slurring her speech while in the kitchen which he believed indicated that "she was kinda drunk." Defendant recalled that he was cooking in the kitchen when he told M.B. that he no longer wanted to be in a relationship with her. He said this angered her and she picked up the skillet of food he had been cooking and acted as though she were about to thrown it at him, but then slid it across the stove and into the sink. He tried to move away from M.B., but she ran towards

him through the hallway and fell. He denied striking M.B. in any way but averred that she was hitting him repeatedly after getting up from her fall. He denied hiding the phone from M.B. and said he went to his son's upstairs room following the altercation.

¶ 15    Defendant then testified that he fulfilled M.B.'s request to bring her a foot massager sometime shortly after the fight ended. He stated that he had no further discussion with her after that. Sometime after, on January 15, 2016, defendant went to the Rockford Police Department and obtained an order of protection against M.B. Later that evening, he allowed the deputy from the Winnebago County Sheriff's Department to enter the residence and serve M.B. with the order of protection.

¶ 16    The trial court issued its findings on May 4, 2017. The trial court found as follows:

> "There's really no dispute that this lady got a broken ankle. Count 1 requires proof of great bodily harm, Count 2 requires proof of bodily harm. I guarantee you a broken ankle qualifies as bodily harm and I guarantee you under the law a broken ankle also counts as great bodily harm. So then the issues as I see them are: Did this defendant knowingly perform an act which made physical contact with [M.B.]; and, if so, did that conduct result in the broken ankle itself[?]
>
> Now, their testimony on these points are distinctly different. She says he pushed her down, stepped on her ankle, she started to get up[,] he pushed her down again, he grabbed her and made like he was going to hit her, her daughter came out and said no, don't hit her, and as a result of that he walked away and did not strike her.
>
> ***

He said that he never touched her. He said that she chased after him, she fell down on her own, "then started hitting me," and at that point in time he attempted to block the punches and then grabbed her by one of her arms and he described and showed where he grabbed her by the bicep area, which would arguably be consistent with the bruising she had on her upper left arm. It's a significant bruise by the way on the upper left arm, but that would be arguably consistent with that.

\*\*\*

But, in this particular case, I have to weigh the credibility of both witnesses and one of the things I just can't get away from is the fact she had a broken ankle. So it was argued that she was in the house all day long and did nothing to call the police or did nothing to go anywhere to get help. She was laid up in bed with a broken ankle, that makes perfect sense to me. And the first time that she had an opportunity to say something to somebody was when [the Winnebago County Sheriff's Deputy] \*\*\* came out to serve the order of protection, that she then said something to that deputy that resulted in the deputy transporting her.

\*\*\*

But the fact that she ended up having a broken ankle I think that actually lends a lot of credibility to her story.

\*\*\*

On the other hand, [defendant] testified in here that she punched him the head and in the face at least 15 times with a closed fist, he had no injuries whatsoever even by his own admission, that just doesn't happen. So I found that his testimony is incredible. I find

that her testimony is credible [t]hat there was physical contact by [defendant] with [M.B.] and it was knowing and intelligent physical contact.

*** 

So looking at the bill of indictment *** Count 1, aggravated domestic battery involving knowing contact which caused great bodily harm to [M.B.], who was a family member or household member, in that [defendant] broke her ankle, the court finds [defendant] guilty.

As to Count 2 of that bill of indictment, domestic battery, that he knowingly, without legal justification, caused bodily harm to [M.B.], a family member or household member, in that he stepped on her ankle causing her ankle to break ***. I do find that he committed the offense of domestic battery as charged in Count 2.

Now, that charge is essentially the same offense as alleged in Count 1, so the conviction in Count 2 merges into the conviction of Count 1. So that is the ruling of the court."

¶ 17    On June 2, 2017, defendant filed a posttrial motion arguing that the trial court erred in allowing Dr. Kotecki to testify to her alleged care and treatment of M.B., as the State failed to lay an adequate foundation for her testimony. The motion further argued that Kotecki did not recall encountering or treating M.B. Thus, defendant asserted, the State failed to lay an adequate foundation for introducing either M.B.'s medical records or Kotecki's testimony regarding their content. On September 1, 2017, the trial court denied defendant's post-trial motion and sentenced him to 180 days in jail and 48 months' probation.

¶ 18    Defendant then filed this timely appeal.

¶ 19                                    II. ANALYSIS

¶ 20    On appeal, defendant contends that the trial court abused its discretion in allowing Dr. Kotecki's testimony about M.B.'s x-ray results and the cause and extent of her injuries. Defendant argues that (1) Dr. Kotecki's testimony about the x-ray results was inadmissible hearsay as her testimony was based on reviewing a chart and recounting the usual course of her practice, not her independent recollection; and (2) that it was error for the trial court to allow Dr. Kotecki's testimony to stand when she admitted both that she could not recall treating M.B. and that her testimony was based on reviewing a chart not presented as evidence or identified as a true and accurate record of her observations.

¶ 21    Before delving into our analysis of defendant's contentions, we must first address the State's argument that defendant has forfeited the contentions raised in this appeal. The State argues that (1) defendant's objections as to a proper foundation for Dr. Kotecki's testimony were not sufficiently specific to preserve that issue for review; and (2) defendant's contention that M.B.'s x-ray was improperly admitted into evidence because it was hearsay, was not specifically raised in his posttrial motion.

¶ 22    To preserve an issue for review, a defendant must both object at trial and raise the issue in a written posttrial motion. *People v. Lewis,* 223 Ill. 2d 393, 400 (2005). The posttrial motion must specify the grounds for a new trial. *Lewis,* 223 Ill. 2d at 400.

¶ 23    As we will discuss in this analysis, each of defendant's contentions are driving at the same fundamental argument. Specifically, that the State failed to lay a proper foundation for Kotecki's testimony for it to qualify as a past recollection recorded exception to the hearsay rule. Defense

counsel voiced several objections, including a continuing objection, as to foundation for Kotecki's testimony. Defendant's posttrial motion states

"5. That the Court improperly allowed the State to introduce and admit into evidence the expert testimony of Dr. Jane Kotecki as to her alleged care and treatment of the alleged victim, [M.B.], as the State failed to lay a proper foundation for the entry of said evidence.

6. That Dr. Jane Kotecki did not have a recollection of the alleged victim [M.B.] and/or her care and treatment of the alleged victim and the State failed to lay a proper foundation for the use of the alleged victim, [M.B.]'s medical records for such records to be introduced or for Dr. Jane Kotecki to testify in regards to their content."

Based on defense counsel's objections on the record during the State's examination of Kotecki and the statements in defendant's posttrial motion the contentions raised in this appeal are sufficiently preserved for our review. We now move on to addressing those contentions.

¶ 24    The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *Becker*, 239 Ill. 2d 215, 234. Decisions of whether to admit expert testimony are reviewed using this same abuse of discretion standard. *Id*.

¶ 25    Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); *People v. Caffey*, 205 Ill. 2d

58, 88 (2001). A past recollection recorded is not excluded by the hearsay rule. Ill. R. Evid. 803(5) (eff. Sep. 28, 2018). A past recollection recorded is "a memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly." *Id.*

¶ 26　Medical records are admissible as the foundation for forming the testifying expert's opinion when they consist of facts and data reasonably relied upon by experts in the medical field to reach their own conclusions. Ill. R. Evid. 703 (eff. Jan. 1, 2011); *People v. Williams,* 238 Ill. 2d 125, 136–37 (2010). "However, 'it is fundamental that a witness'[s] memory can be refreshed only after it has been established that the witness has no memory concerning the facts in question.' " *People v. Cantlin*, 348 Ill. App. 3d 998, 1003 (2004) (quoting *People v. Shatner,* 174 Ill.2d 133, 153 (1996) ). If a witness lacks independent recollection of the occurrence about which she is testifying and a record or memorandum fails to refresh her current recollection, the document itself may be admissible as a recorded recollection if certain foundational requirements are met. *Cantlin*, 348 Ill. App. 3d at 1003. A witness may also refer to documents to refresh her recollection prior to taking the stand. *Id*. However, the witness must then testify from her independent recollection. *Id*. (citing *People v. Griswold,* 405 Ill. 533, 541–42 (1950) ).

¶ 27　To fall within the past recollection recorded exception to the hearsay rule, the evidence must meet four requirements: (1) the witness had firsthand knowledge of the recorded event; (2) the written statement was made at or near the time of the event and while the witness had a clear and accurate memory of it; (3) the witness lacks present recollection of the event; and (4) the witness can vouch for the accuracy of the written statement. *People v. Beasley*, 307 Ill. App. 3d

200, 207 (1999); *Jenkins*, 10 Ill. App. 3d at 171-72. The witness must authenticate the writing by stating that she recorded the facts at the time of the occurrence, and that the record is truthfully and accurately a record of the facts as she observed them at the time. *People v. Munoz*, 31 Ill. App. 3d 689, 694 (1975).

¶ 28    In *Jenkins*, the defendant was convicted of rape and armed robbery. *Jenkins*, 10 Ill. App. 3d at 167-68. At trial, the State introduced testimony from the physician that examined the victim following the alleged incident. *Id*. at 169. The physician initially stated that he had no recollection of examining the victim. *Id*. at 171. He was given the hospital report which he had filled out at the time of the examination. *Id*. He then stated that his recollection was refreshed but proceeded to testify only to the facts set out in the record. *Id*. The physician testified in terms of the general procedure in examining rape victims, and not specifically in terms of the examination of the victim. *Id*. On cross-examination the physician admitted that he did not recall examining the victim and could only testify after reading the hospital record. *Id*. The hospital record was not admitted into evidence. *Id*. at 169. Defense counsel then moved to strike the physician's testimony, but the trial court denied the motion. *Id* at 171.

¶ 29    On appeal, the defendant contended that the testimony of the victim's examining physician was improperly admitted into evidence. *Jenkins*, 10 Ill. App. 3d at 171. He argued that it was error to allow the physician to testify because he could not independently recall the facts of the victim's examination after attempting to refresh his memory. *Id*. In addition, defendant argued that the hospital record was not admissible as evidence of the examination. *Id*.

¶ 30    The appellate court in *Jenkins* agreed with the defendant. The court found that the record demonstrated that the physician did not testify from his independent recollection, but instead relied

solely on the hospital report. *Jenkins*, 10 Ill. App. 3d at 171. The State failed to lay the proper foundation for the past recollection recorded exception, as the physician failed to confirm that he made the hospital record at the time he treated the victim and did not testify that the hospital record was a true and accurate reflection of what he observed in treating the victim. *Id*. at 172. The court held that the contents of the hospital report were inadmissible as evidence, and the testimony of the physician should have been stricken. *Id*. Although eyewitness testimony and the victim's identification of defendant would have been enough to uphold the conviction, the conviction was ultimately reversed on a separate issue on appeal combined with the trial court's error in admitting the medical testimony. *Id*.

¶ 31    *Jenkins* is instructive for both of defendant's contentions in the present appeal. Regarding M.B.'s x-ray, Kotecki admitted on cross-examination that she did not perform or oversee the x-ray. She did not recall viewing the x-ray. She did not recall ordering the x-ray but testified that ordering x-rays was something she routinely did as part of her practice. She admitted that she could not recall treating M.B. for her injury. Her testimony that M.B. suffered a broken ankle was based entirely on "the ordinary course of [her] practice," not her personal knowledge. At no point in her testimony did Kotecki state that the x-ray was a true and accurate reflection of what she observed when treating M.B. The x-ray was not admitted into evidence.

¶ 32    Similarly, Kotecki's testimony about treating M.B. was based entirely on reviewing her treatment chart, which was not admitted into evidence. Kotecki testified that she routinely created charts when treating patients and what information she normally entered when creating the charts. She stated that she routinely filled out the charts before the end of her shift if she could not complete them near the time in which she treated the patient. However, she never testified that the

chart she relied upon when testifying to M.B.'s treatment was a true and accurate record of her observations at or near the time of her treatment. Indeed, she admitted that she had no recollection of treating M.B. at all. Her testimony was entirely based upon reviewing her chart, not her independent recollection.

¶ 33    Based on the foregoing, we find that the State failed to lay a proper foundation for Dr. Kotecki's testimony regarding M.B.'s x-ray results or treatment for her injury. Her testimony as to the x-ray and treatment chart were not admissible under the past recollection recorded exception to the hearsay rule.

¶ 34    Further, Kotecki's testimony was not admissible under the refreshed recollection exception to the hearsay rule. The doctrine of refreshed recollection has been held to permit a witness to refresh her memory by the use of a written memorandum with the only provision that, after looking at the memorandum, the witness can speak to the facts from her own recollection. *People v. Vance*, 53 Ill. App. 3d 573, 581 (1977). This is so even though the memorandum used to refresh the recollection of the witness is a hospital record. *Vance*, 53 Ill. App. 3d at 581.

¶ 35    In *Cantlin*, the defendant appealed his conviction for driving under the influence and argued that one of the arresting officers' testimony regarding field sobriety tests was based on his reading of the report rather than his independent recollection and, thus, improper for lack of foundation. *Cantlin*, 348 Ill. App. 3d at 1002. This court remarked as to the record's illustration that the officer's testimony "consistently maintained that he had at least some independent recollection of the incident" and the State was not required to refresh his memory. *Cantlin*, at 1003. In dismissing the defendant's contention, this court further noted that "a fair inference" from the officer's testimony was that he "refreshed his recollection from his report before testifying." This

court then reiterated that a witness may refer to documents to refresh recollection prior to taking the stand but must then testify from independent recollection. *Id*.; *Supra* ¶ 26. We cited *Corrales v. American Cab Co.*, 170 Ill. App. 3d 907, 911 (1988), for support in holding that "the extent to which the documents actually refreshed the witness's recollection goes to the weight, not the admissibility, of his testimony." *Cantlin*, at 1003.

¶ 36    In *Corrales*, the plaintiff was stuck by a taxicab when walking across an intersection, suffered injuries, and sued the defendant taxi company in negligence. *Corrales*, 170 Ill App. 3d at 909.   On appeal, plaintiff asserted that the testimony of the attending physician, on call in the emergency room when plaintiff was treated, was impermissible hearsay because he had no independent recollection of treating plaintiff, and the hospital records did not refresh his recollection. *Corrales*, at 911. The appellate court's review of the record showed that the physician testified that the records did refresh his recollection and, "the extent to which the records refreshed his memory merely goes to the weight, not the admissibility of his testimony. *Id*. (citing *Country Casualty Insurance Co. v. Wilson*, 144 Ill. App. 3d 28 (1986)).

¶ 37    In *Country Casualty Insurance Co. v. Wilson*, the plaintiff insurance company sought a declaration that it was not required to defend and indemnify the defendant for damages resulting from a car accident that severely injured his passenger. *Country Casualty*, 144 Ill. App. 3d at 30. Plaintiff alleged that defendant purchased his vehicle on September 8 and took no steps to insure it before the accident that occurred on October 17. *Id*. An agent of plaintiff testified that he met with defendant's mother (who apparently dealt with her son's insurance company) on September 16 about transferring coverage from a previously insured car to the new vehicle or securing a new insurance policy. *Id*. The agent testified that he did not speak with defendant's mother again about

the policy until October 17 at 11:00 a.m. when she presented him with a check dated October 14 to transfer the policy from the previously insured vehicle to the one newly purchased. *Id*. The agent effectuated the transfer at 11:30 a.m. Defendant's mother testified that she was unaware of her son's accident when she made the policy transfer. *Id*. at 32. The trial court made a declaration of no coverage.

¶ 38    Although reversed on other grounds, the appellate court addressed a controversy over the testimony of a nurse that treated defendant following the accident. *Id*. at 32. The nurse testified to having no independent recollection of defendant's hospital stay, however, her notes indicated that defendant's mother was contacted at 10:35 a.m. regarding her son's car accident. *Id*.  The appellate court held that proper foundation was laid for the admission of the nurse's notes as past recollection recorded because she testified that the notes were accurate when recorded but the conclusion that it was defendant's mother to whom she was speaking at 10:35 a.m. on October 17 was without proper foundation. *Id*. at 32-33. Because an adequate foundation was laid for the admission of the nurse's notes as a past recollection recorded, the nurse's absence of memory as to the recipient of the call "goes to the weight of [the] evidence and can be brought to the [trier of fact's] attention as a form of impeachment." *Id*. at 33.

¶ 39    Although it is not clear from the opinion in *Corrales*, the appellate court's holding that the attending physician's testimony regarding hospital records was admissible as a refreshed recollection exception to hearsay, assumes that the record in that case would reveal a proper foundation laid for the physician's testimony to the hospital records under the past recollection recorded doctrine. See *Country Casualty*, at 32-33. The attending physician must have testified that (1) he had firsthand knowledge of the recorded event; (2) the hospital records were made at

or near the time of the event and while the he had a clear and accurate memory of it; (3) he lacked a present recollection of the event; and (4) he could vouch for the accuracy of the written statement. See *supra* ¶ 27. The *Corrales* court's reliance on *Country Casualty* would be misplaced without this assumption.

¶ 40   Returning to *Cantlin*, when questioned regarding his report, the officer testified that he wrote the report the morning of the incident when the incident was fresh in his mind and, following his review of the report, his memory of the incident was refreshed. *Cantlin*, at 1002. Therefore, even though this court ultimately held that the officer testified from his independent recollection and didn't need his memory refreshed, it can be inferred from our opinion that a proper foundation for the officer's report under the past recollection recorded exception was sufficiently laid for his subsequent refreshed recollection, going to the weight, not the admissibility, of such testimony. See *Cantlin*, at 1003; *Corrales*, at 911; *Country Casualty*, at 33.

¶ 41   In the present appeal, as stated above, there was an inadequate foundation for Kotecki's testimony regarding both M.B.'s x-ray and treatment as past recollection recorded. Indeed, neither the x-ray nor treatment chart were entered into evidence. Kotecki admitted on cross-examination that she had no independent recollection of either treating M.B. or viewing her x-ray. On redirect, she testified that she had an opportunity to review M.B.'s treatment chart prior to trial and based her testimony on that review. This did not perfect a proper foundation, however. At no time during Kotecki's testimony was it established that she had any independent recollection about the occurrence to which she was testifying. At the trial court's prodding, she testified that she makes a patient's chart either at the time of treatment or near the end of her shift, depending on how busy the hospital is at that particular time. She did not testify when M.B.'s chart was created, nor did

she vouch for its accuracy. She did not vouch for the accuracy of M.B.'s x-rays or treatment chart after admitting her lack of recollection in viewing them. Because a proper foundation was not laid for the admissibility of Kotecki's testimony regarding the treatment of M.B. or the examination of her x-ray as a past recollection recorded, it was likewise not admissible as a refreshed recollection as Kotecki did not testify from her independent recollection. However, this does not end our analysis as to whether defendant is entitled to a new trial based on the trial court's failure to strike Kotecki's testimony.

¶ 42     Defendant was convicted of aggravated domestic battery (720 ILCS 5/12-3.3 *et seq* (West 2016). A conviction of aggravated domestic battery requires proof that "[a] person who, in committing a domestic battery, knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated domestic battery." 720 ILCS 5/12-3.3(a) (2016). Whether an injury constitutes great bodily harm is a question for the trier of fact. *People v. Cisneros,* 2013 IL App (3d) 110851, ¶ 12; *People v. Figures,* 216 Ill. App .3d 398, 401 (1991). The term "great bodily harm" is not susceptible of precise legal definition. *People v. Doran,* 256 Ill. App. 3d 131, 136 (1993). It requires an injury of a greater and more serious character than an ordinary battery. *Figures,* 216 Ill. App. 3d at 401.

¶ 43     Here, in finding the defendant guilty of aggravated domestic battery, the trial court articulated that M.B. having suffered a broken ankle was a basis for convicting defendant of that charge. See *supra* ¶ 16. Even if defendant is correct that the trial court improperly relied on Dr. Kotecki's testimony in reaching its decision, the trial court reached the correct judgment but, perhaps, for the wrong reason. We review the trial court's judgment, not its reasoning. *People v. Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 60. We can affirm the trial court's judgment on any

basis supported by the record. *Id*. Based on the record presented to this court, we do not find defendant's conviction of aggravated domestic battery to be in error.

¶ 44    When reviewing the sufficiency of the evidence, the standard is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found all essential elements of the offense beyond a reasonable doubt. *People v. Maples*, 2018 IL App (2d) 160557, ¶ 30. In reviewing the sufficiency of the evidence, we will not substitute our judgment for that of the trier of fact on the weight of the evidence or the credibility of the witnesses. *Id.* We do not retry the defendant, and we will reverse the defendant's conviction only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies reasonable doubt of the defendant's guilt. *People v. Lissade*, 403 Ill. App. 3d 609, 612 (2010). The trial court's credibility determinations are accorded great deference (*People v. Brown*, 2013 IL 114196, ¶ 48), and here, the court's credibility determinations were not unreasonable.

¶ 45    A reasonable trier of fact could have determined that defendant caused great bodily harm to M.B. The trial court heard testimony from Officer Hedlund who recounted his observation of M.B. at Rockford Memorial Hospital. He testified that she had "a bruise on her left arm and one of her ankles was swollen." People's Exhibits 1, 2, and 3, photographs he took of her injuries, further support Officer Hedlund's testimony. He recalled M.B. stating that defendant either stepped or stomped on her ankle during their altercation. Additionally, the trial court found defendant's testimony on the events of the evening of the alleged incident to be "incredible."

¶ 46    M.B. herself testified that she was treated at the hospital with "an aircast or air boot" that she wore for three months. She described her ankle as "swollen" and that she had a lot of pain following her altercation with defendant in which he stomped on it. She testified that she had

trouble walking and getting out of bed following the incident. Although the trial court used inadmissible evidence in stating that "the fact that [M.B.] ended up having a broken ankle I think that actually lends a lot of credibility to her story," the trial court went on to find that her "testimony is credible [t]hat there was physical contact by [defendant] with [M.B.] and it was knowing and intelligent physical contact."

¶ 47    The trial court's findings on both Officer Hedlund's and M.B.'s credibility lend support to the assertion that a reasonable trier of fact could find that defendant caused great bodily harm, even without expert testimony that M.B.'s ankle was "broken." The evidence showed that defendant stomped on M.B.'s ankle at least once after pushing her to the ground, causing her described injuries and the necessity of an aircast for months after. Courts of review have upheld findings of great bodily harm under comparable circumstances. See *People v. Matthews*, 126 Ill. App. 3d 710 714-15 (1984) (upholding finding of great bodily harm after victim stated that she did not require medical attention and sustained only a bruise on her head after being struck on the head with a gun and struck on the arms and head with a baseball bat.); *People v. Cross*, 84 Ill. App. 3d 868, 872 (1980) ("Certainly, striking the victim on the head with a lead pipe may be properly construed as inflicting great bodily harm."); *People v. Carmack*, 50 Ill. App. 3d 983, 985–86 (1977) (the jury's finding of great bodily harm was affirmed where the victim was struck by a wooden stick or club and there was a hematoma behind his ear, bruising about his right eye, swelling on the back of his neck, and a scalp laceration that would have required stitches had he sought immediate medical attention).

¶ 48    The record in this case supports affirmance of defendant's conviction of aggravated domestic battery as the evidence presented to the trial court illustrates that the State proved beyond

a reasonable doubt that defendant, while committing a domestic battery, "knowingly cause[d] great bodily harm" to M.B. 720 ILCS 5/12-3.3(a) (West 2016). Therefore, we affirm defendant's conviction of aggravated domestic battery.

¶ 49                              III. CONCLUSION

¶ 50    For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

¶ 51    Affirmed.